IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff-Respondent,

v.                            CIV 06-0940 WJ/KBM
                                   CR 02-0501 BB

DAVID DURAN-SALAZAR,

       Defendant-Movant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before the Court on Defendant David Duran-Salazar's motion for post-conviction relief under 28 U.S.C. § 2255. *See Doc. 1.* Such motions are often referred to as "petitions,"[1] and in this case Defendant (or "Duran") calls himself the "Petitioner." Accordingly, throughout this opinion I will refer to his § 2255 motion as a § 2255 petition. The United States moves to dismiss the petition as time barred, or alternatively, without merit. *See Doc. 6.*

---

[1] *E.g., Purvis v. Wiley,* 2007 WL 196550 (10th Cir. 2007) (defendant filed a "motion . . . to vacate . . . pursuant to . . . § 2255 . . . A § 2255 petition attacks the legality of a conviction"); *see also, e.g., Medberry v. Crosby,* 351 F3d 1049, 1058 (11th Cir. 2003) ("there are two distinct means of securing post-conviction relief in the federal courts: an application for a writ of habeas corpus (governed by, inter alia, §§ 2241 and 2254) and a motion to vacate a sentence (governed by § 2255 ). Because the post-conviction statutes are complicated and cumbersome, we often found it convenient to refer generally to cases implicating these statutes as "habeas corpus cases." We also referred simply to " § 2241 petitions," " § 2254 petitions," and " § 2255  petitions," while recognizing that there are "important distinctions between the two post-conviction remedies.").

Because it is possible to resolve the issues on the pleadings, and the record establishes conclusively that Defendant is not entitled to relief, I find that an evidentiary hearing is not necessary.  *E.g., Koskella v. United States,* 198 Fed. Appx. 780, 781 (10th Cir. 2006);  28 U.S.C. § 2255.   I further recommend that the petition be denied on the merits and dismissed with prejudice.

## I.  § 2255 Petition Is Timely

After the jury convicted Defendant and two others of "back packing" marijuana into the United States from Mexico, the Tenth Circuit consolidated the appeals and affirmed on February 23, 2005.  *See, e.g., United States v. Rascon-Garcia, et al.,* CR 02-501 BB (Doc. 143) (hereinafter the underlying criminal case will be cited as "*United States v. Duran-Salazar,* CR 02-501 WJ"); *United States v. Duran-Salazar, et al.,* 123 Fed. Appx. 946 (10th Cir. 2/23/05).  Defendant filed a petition for certiorari with the United States Supreme Court, which was denied on October 3, 2005.  *See Duran-Salazar v. United States,* ___ U.S. ___, 126 S. Ct. 164 (2005).

The § 2255 petition was signed and delivered to prison authorities at the Federal Correctional Institution where Defendant is housed (Big Spring, Texas) on September 29, 2006, and was marked "filed" by this Court on October 2, 2006.  *See Doc. 1* (docket stamp and certificate of service).  Because the Tenth Circuit uses

the "anniversary date" to calculate the one-year limitations period, this § 2255

petition is timely. *See, e.g., United States v. Hurst,* 322 F.3d 1256, 1260 (10th Cir.

2003); *United States v. Burch,* 202 F.3d 1274, 1278-79 (10th Cir. 2000). I therefore

recommend denying dismissal of the § 2255 petition on timeliness grounds. *See*

*Doc. 6* at 2-3.

## II.  Treatment Of Procedurally-Defaulted Claims

The United States asserts that certain non-ineffective assistance of counsel

claims are procedurally defaulted because they were not raised on direct appeal. I

agree with the legal propositions set forth by the United States. However, I read

Defendant's petition and reply as an attempt to invoke the ineffectiveness

exception to this general rule. *See Massaro v. United States,* 538 U.S. 500, 504

(2003); *see also Docs. 1, 9.*

As a practical matter, in analyzing whether this exception applies, I would

have to examine the underlying claims anyway to determine if appellate counsel

was unreasonable in failing to raise the issue on direct appeal and/or trial counsel

was ineffective in failing to preserve them for appellate counsel to raise. Thus, I

proceed directly to a discussion of the merits of the claims and find that, to the

extent that any claim is procedurally defaulted, its lack of merit fails to establish the

requisite cause or prejudice. *See, e.g., United States v. Moore,* 172 Fed. Appx. 877, 881-882 (10th Cir. 2006); *United States v. McCalister,* 165 Fed. Appx. 599, 603-611 (10th Cir. 2006).

## III.  Analysis Of Merits

By my count, Defendant raises sixteen interrelated and overlapping claims in his § 2255 petition and below I group some claims together for ease of analysis.  For all of the ineffective assistance of counsel issues, I apply the two-prong *Strickland* test.[2]

### A. Various Attorneys & Judges

There were a number of different appointed attorneys for Defendant throughout trial and appeal, as well as a number of judges who presided over different portions of the case.  Fairly early in the proceedings, the first appointed private attorney for Defendant, Matthew Bradburn, was permitted to withdraw because he was closing his law practice.  Herman Ortiz was then appointed to represent Defendant.  Visiting Senior Judge Filemon B. Vela, now deceased,

---

[2]  Defendant must show that counsel's conduct was constitutionally deficient and that but for the conduct, the result of the proceeding would have been different.  Failure to make either showing defeats the claim. *E.g., Smith v. Robbins,* 528 U.S. 259, 286, n.14 (2000); *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *United States v. Orange,* 447 F.3d 792, 796-97 & n. 5 (10th Cir. 2006).

4

presided over the voir dire and trial.  Ortiz was permitted to withdraw after visiting

Judge William K. Sessions III ruled on the defendants' post-trial motions for new

trials.  A third attorney – Howard Anderson – was appointed to represent

Defendant for sentencing purposes.  District Judge William P. Johnson ruled on

Defendant's motion for a downward departure and sentenced him.  Anderson was

permitted to withdraw after sentencing, and James Maus was appointed to represent

Defendant on direct appeal.  *See, e.g., United States v. Rascon-Garcia, et al.,* CR 02-

501 BB  (hereinafter the underlying criminal case will be cited as "*United States v.*

*Duran-Salazar,* CR 02-501 WJ") (Docs. 28, 30, 31, 55, 62, 65, 74, 76, 82, 109, 113,

114, 116, 122); *see also Voir Dire & Trial & Motions & Sentencing Transcripts.*

### B.  Overview Of Factual Background

Border Patrol Agent Mark Shank testified that in the early morning hours,

and from an elevated vantage point using infrared equipment, he spied five images

congregating near a house on the Mexico side of the border.  The images appeared

to him to be men carrying backpacks as they began walking toward the border.

Shank directed other agents toward the moving images so the agents could

intercept them in a gully after they crossed the border.

The endeavor was complicated by a moving train that blocked the other

agents' view and because some of the images scattered and ran. Eventually five

people were arrested. One was located right next to six bags filled with drugs. He

was tried with Defendant and another person who were found at least one hundred,

and perhaps as far as two hundred, yards away from the bags. Shank testified that,

although he did not use the record function on the infrared equipment, the images

on the screen were never out of his sight.

In a concerted defense, defendants contended that they were in the wrong

spot at the wrong time after illegally crossing the border, and happened to be caught

in the vicinity where others had hauled in backpacks of drugs. *See, e.g., United

States v. Corral-Gastelum,* 240 F.3d 1181 (9th Cir. 2001) (group of illegal immigrants

near marijuana bundles is insufficient to establish drug conspiracy). Taken

together, defense counsel focused the jury's attention on these points: Agent

Shanks did not make a recording of what he saw; another infrared videotape of the

same area at night showed how difficult it is to discern what an image represents

(*i.e.,* an animal or a human or a rock) and that there are spots where images were

obstructed and cannot be seen; the area near the railroad tracks has bushes that

make it a common place for illegal immigrants to hide and wait to hop onto a train;

the date in question, January 12th, is a busy day for attempted illegal entries into the

United States; the other agents being directed toward the images could not see who

fled because of the train; no agent could identify Defendant as one of the images that fled; and the agents did not run tests for footprints or fibers to connect any of the individuals arrested with the backpacks. *See e.g., Duran-Salazar,* 123 Fed. Appx. at 947-48; *United States v. Duran-Salazar, No. 03-2313, Defendant-Appellant's Opening Brief On Direct Appeal* at 5-8 (available at 2004 WL 3634611); *Trial Transcript* at 18-399.

The jurors received the case on a Friday afternoon and returned the next morning.  After deliberating only twenty minutes on Saturday, one juror informed the Court that "'she was having difficulty and that she had already reached a decision in the case.'" *Duran-Salazar,* 123 Fed. Appx. at 948.  The trial judge gave an instruction encouraging the jurors to continue the deliberations.  Two hours after that, he gave a similar instruction in response to a jury note that they could not reach a verdict.  One hour later, he gave an *Allen* charge in response to a jury note that it had reached a verdict on the conspiracy count, but could not reach a verdict on the specific drug importation counts.  Thirty minutes later, the jury returned with a guilty verdict as to all defendants on all counts. *See, e.g., id.*  After trial concluded, the juror stated that the experience had been "very difficult and that 'everybody else was against [her], and the judge would not accept a hung jury; so, therefore, [she] kind of felt like [she] had to sway [her] opinion, even though

7

[she] didn't believe it.'" *Id.* at 949.

After his motion for a new trial was denied, Defendant's motion requesting a downward departure for minimal participation was denied. Duran was sentenced to 151 months on each count, with the sentences to run concurrently for a total of 12.5 years incarceration with the recommendation that immigration removal proceedings begin while he was serving his sentence. *See United States v. Duran-Salazar,* CR 02-501 WJ (Docs. 82, 109, 113); *Sentencing Transcript* at 4,6.

## C. Constitutionality of Conspiracy Statute

Defendant raises a constitutional challenge to 21 U.S.C. § 846, and evidently believes he was convicted under that statute. *See Doc. 1* at 8-9 (Ground 6) ("Title 21 U.S.C.S. § 846 is unconstitutional . . . the statute of § 846 under Title 21 USCS, is unconstitutional"). It is true that the criminal complaint charged him solely with conspiracy to possess drugs with the intent to distribute them. *See United States v. Duran-Salazar,* CR 02-501 WJ (Doc. 1 at 1). The indictment also contained the same count. *See id.* (Doc. 24, Count IV). However, the indictment also contained three importation charges, including conspiracy under 21 U.S.C. § 963,[3] which

---

[3] Count I of the indictment charges him with conspiracy to import specified amounts of cocaine and marijuana prohibited by 21 U.S.C. § 952(a); 21 U.S.C. § 960(a)(1); 21 U.S.C. § 960(b)(1); 21 U.S.C. § 960(b)(3) "[i]n violation of 21 U.S.C. § 963." *United States v. Duran-Salazar,* CR 02-501 WJ (Doc. 23 at 2). Count II charges him with "knowingly and intentionally" importing "5 kilograms and more of Cocaine" and Count III charges him with "knowingly and

prohibits "attempts" and "conspiracies" to **import** controlled substances.

Importation charges are separate and distinct from possession charges.[4]

Defendant and two others, Arturo Rascon-Garcia and Ignacio Alvarez-Perez
were tried together only on the first three charges in the indictment:  conspiracy to
import cocaine and marijuana; importation of cocaine; and importation of
marijuana.  The United States did not pursue the possession count at trial.[5]  Since

─────────────────

intentionally" importing "50 kilograms and more of Marijuana." *Id.* at 2-3.

Section 952(a) prohibits the importation of prohibited controlled substances or narcotics
to the United States.  Section 960(a)(1) defines as unlawful the knowing or intentional
importation of a controlled substance contrary to § 952.  Sections 960(b)(1) and 960(b)(3)
provide the penalties for importation of cocaine or marijuana.  Section 963 provides that "[a]ny
person who attempts or conspires to commit any offense defined in this subchapter shall be
subject to the same penalties as those prescribed for the offense, the commission of which was the
object of the attempt or conspiracy."

[4]       Sections 846 and 963 specify different ends as the proscribed object
of the conspiracy — distribution as opposed to importation — and it
is beyond peradventure that "each provision requires proof of a fact
[that] the other does not."  Thus . . . the unequivocal
determination [is] that §§ 846 and 963, like §§ 1 and 2 of the
Sherman Act which were at issue in *American Tobacco,* proscribe
separate statutory offenses the violations of which can result in the
imposition of consecutive sentences.

*Albernaz v. United States,* 450 U.S. 333, 339 (1981).

[5]  Though the docket sheet only contains a dismissal of Count IV as to Rascon-Garcia, it
was clear that the United States dropped the Count IV possession charges as to all defendants.
The trial judge nevertheless did instruct the jurors that mere proximity to the drugs was
insufficient to convict on the importation charges and that they had to find actual or constructive
"possession" to convict on the importation charges.  *See, e.g., United States v. Duran-Salazar,* CR
02-501 BB (Docs. 23, 50-52, 83-84); *Trial Transcript* at 383-84 (United States informed trial
judge that the "fourth count has been dismissed by the Government" and that it was only
pursuing the three importation counts); *id.* at 396-98, 404 (instructions on proximity and

Defendant is *pro se,* however, I will liberally construe his claim as applying to § 963.

He contends the conspiracy statute is "unconstitutional because it creates fear and violated Fifth Amendment Protections, being like the Roman, Portugese and Spanish Inquisitions caused fear to make people turn on each other" and further explains:

> During the Christian inquisitions, where people were tried for heresy and other crimes, based on testimony of others, this was done because of fear of torture, imprisonment, death and other causes.  Like the Christian Inquisitions, and the fear it targeted, the conspiracy laws of the United States have become a weapon for Government to impose fear and threat of long term draconian sentences, to make people turn against each other, tell on family, friends, and become a "Judas" America.  Thus, based on the protections of Fairness under the Fifth, Sixth and Fourteenth Amendment, and the limitations of Government's imposing laws that deprive fair trials, the statute . . . is unconstitutional and must be held such.

*Doc. 1* at 8-9.

The wisdom and effect of a criminal statute are not the benchmark of its constitutionality.  It is well-settled that "the power of punishment is vested in the legislature, not the judicial department.  It is the legislature, not the Court, which is to define a crime and ordain its punishment."  *United States v. Wiltberger,* 18 U.S.

---

possession).

76, 95 (1820); *see also Crandon v. United States,* 494 U.S. 152, 158 (1990)

("legislatures, not courts, define criminal liability").

Where, as here, the Government has the burden of proof beyond a

reasonable doubt on each element of the legislatively-defined and unambiguous

crime that applies to all persons similarly situated, the criminal statute passes

constitutional muster.[6]   Accordingly, I find Ground 6 of the petition without merit.

*Doc. 1* at 8-9.

### D.  *Claims Decided On Direct Review Are Waived*

In various configurations, Defendant claims that the evidence was

insufficient to convict him of conspiracy.  For example, he claims that a conspiracy

"requires 'proof' of an agreement between parties" but in his case "no evidence

exists that any conspiracy to violate laws, together, exists."  He asserts that to the

"contrary, the parties lived in different locations, and just happened to be at the

same location, to enter the United States at the same time" and that "the

agreement was not shown and it is impossible to tell what the jury found him guilty

---

[6]  *E.g., Crandon v. United States,* 494 U.S. 152, 158 (1990); *Kolender v. Lawson,* 461 U.S. 352, 357 (1983); *Eisenstadt v. Baird,* 405 U.S. 438, 447 (1972); *see also United States v. Shabani,* 513 U.S. 10, 17 (1994) (§ 846 conspiracy not ambiguous); *Albernaz v. United States,* 450 U.S. 333, 342 (1981) ("The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers.") (internal quotations and citations omitted).

of where the first charge was conpsiracy (sic), and they were hung, until the Allen charge, on the other charges." *Doc. 1* at 8 (Ground 5, paragraphs one and three). He also maintains that the Court's instructions to the jurors during deliberations constituted coercion. *See id.* at 9 (Ground 7).

Among other things, Judge Vela instructed the jurors on the definitions of reasonable doubt, direct and circumstantial evidence, actual and constructive possession, aiding and abetting, as well as knowing and willful association as opposed to mere presence. *Trial Transcript* at 392-400. He then gave the jurors an example of conspiracy and instructed them that, to convict on the charge of conspiracy, they had to find the Government proved beyond a reasonable doubt:

> two or more persons, either directly or indirectly, reached an agreement to import into the United States cocaine and/or marijuana. Two or more persons engaged in an agreement, [like the example], all right?
>
> That the defendant that you have under consideration knew of the unlawful purpose of that agreement, had knowledge. You see, we're getting into that knowing and willful thing.
>
> And in addition to that[,] that the defendant that you have under consideration joined in that agreement willfully; that is, with intent to further its unlawful purpose.
>
> If you find that the Government has proven that as with regard to any one of the defendants by proof beyond

a reasonable doubt, you should find the defendant you have under consideration guilty of Count Number I.  If you're not satisfied that the Government has met its burden in that regard, you should find the defendant you have under consideration not guilty of Count Number I.

You can become a member of a conspiracy without knowing all of the details of the unlawful scheme or without knowing all the identities of all of the persons alleged as conspirators.  If you understand the unlawful nature of a plan or scheme, and you knowingly and intentionally – you knowingly, willfully, and intentionally join in that plan or scheme on one occasion, that's sufficient for you to convict a person for conspiracy, even though the defendant you have under consideration might not have participated in it before, and even though the defendant played only a minor part.  [In my example the only act necessary] was to make a phone call, if he did it knowingly and willfully.

Now, the Government does not have to prove certain things, but what the Government doesn't have to do is, perhaps, not as important as what the Government must prove; for example, the Government doesn't have to prove that the conspirators entered into a formal agreement.  [In my example, it is not necessary that we] write our plan to rob the bank and put in on a blue-back.  It doesn't have to be a formal agreement.  The Government does not have to prove that the conspirators state between themselves all of the details of the scheme.  The Government does not have to prove that all the details of the scheme alleged in the Indictment were actually agreed upon or carried out, nor must the Government prove that all persons alleged to have been members of the conspiracy were such, and that the conspirators actually succeeded in accomplishing their unlawful objective.  [In my example, we] don't have to

actually rob the bank to be guilty of that conspiracy, but
because we didn't, it wouldn't make us any less guilty.

But here again, listen to this: Mere presence at the
scene of an event, even with knowledge that a crime is
being committed, or the mere fact that certain persons
may have associated with each other and may have
assembled together and discussed common aims and
interests does not necessarily establish proof of a
conspiracy. Why? Because in order for [a] person to
become a conspirator, you have to act knowingly and
willfully. A person who had no knowledge of a conspiracy
but who happens to act in a way which advances some
purpose of the conspiracy does not thereby, then become
a conspirator.

Now, you must determine whether the conspiracy
charged in the Indictment existed and, if it did, whether
the defendant that you have under consideration was a
member of it. If you find that the conspiracy charged did
not exist, then you must return a not guilty verdict, even
though you find that some other conspiracy existed. If
you find that a defendant was not a member of the
conspiracy charged in the Indictment, then you must find
that defendant not guilty, even though the defendant may
have been a member of some other conspiracy.

*Id.* at 406-09.[7]

Appellate counsel did challenge the sufficiency of the evidence on appeal

and, although he did not specifically use the word "agreement," it is apparent that is

---

[7] The adequacy of these instructions are not challenged, nor could they be. *See, e.g.,*
TENTH CIRCUIT CRIMINAL PATTERN JURY INSTRUCTIONS, §§ 2.19, 2.20, 2.87, 2.90 (2005) (and
commentary thereto).

the element of the conspiracy charge he was challenging.   For example, appellate

counsel specifically argued that:

>Duran-Salazar argued that there was no evidence linking him to the conspiracy or possession of the backpacks. The evidence proved only that he was in the area and near the crime scene when the government agents arrived.  The regular use of that portion of the desert by illegal immigrants, especially with the train passing through at the time, supported his argument that it was realistic and reasonable for individuals who were not involved in the smuggling operation to be in the area. The lack of lighting in the area, the lack of any physical link to the backpacks, and inability of the agents to give any description of the smugglers created a very reasonable doubt that Duran-Salazar was involved in the operation. T. 432-433.

>* * * * *

>The issue is whether there is sufficient evidence to support the jury's verdict that Duran-Salazar conspired with others to import and did import more than 5 kg of cocaine and more than 50 kg of marijuana.  Although Duran-Salazar was apparently arrested near the scene of the smuggling area (no government witnesses ever affirmatively identified Duran-Salazar as someone they arrested that night), there was no credible evidence linking Duran-Salazar to the conspiracy or proving he imported marijuana and cocaine into the United States. Agent Shank admitted during cross-examination that the view from the FLIR could be obstructed by arroyos, vegetation, and hills.  Government agents also admitted that the area where Duran-Salazar was arrested was an area frequented by illegal immigrants.  Of particular importance is the lack of any footprint trail, fiber

evidence, odors, or strap marks linking the Appellant to
the confiscated drugs.

The jury improperly piled inference upon inference
by assuming that since Duran-Salazar was in the area that
night, he was involved in a conspiracy to import and did
import marijuana and cocaine into the United States.

*Defendant-Appellant's Opening Brief On Direct Appeal* at 8, 14-15 (available at 2004

WL 3634611).  He also argued that Judge Vela's instructions during deliberations

were coercive.  *See id.* at 8-13, 16-19.

The Tenth Circuit rejected both claims.  Agent Shank's testimony that he

kept the images in view was key to the Tenth Circuit finding the evidence sufficient

to convict – "Upon reviewing Agent Shank's testimony, specifically that he never

lost sight of the travelers from the time he spotted them by the house in Mexico

until they were apprehended, we find the Defendants' [sufficiency of the evidence]

arguments meritless."  *Duran-Salazar,* 123 Fed. Appx. at 949.  It extensively

analyzed the other issue and concluded that the instructions were permissible and

did not coerce the final verdict.  *See id.* at 949-50.

Where, as here, a claim is decided on direct appeal, this Court is precluded

from considering it again in a collateral proceeding under § 2255 unless there is an

intervening change of law in the Tenth Circuit specifically made retroactive.  That

is not the case.  *See, e.g., United States v. Pritchard,* 875 F.2d 789, 791 (10th Cir.

1989); *United States v. Walters,* 163 Fed. Appx. 674, 677-678 (10th Cir. 2006) (citing

*United States v. Price,* 400 F.3d 844, 845 (10th Cir.), *cert. denied,* 126 S. Ct. 731

(2005), for the retroactivity proposition).

Defendant further claims that his trial attorneys were ineffective because

they: (1) "allowed the [conspiracy] charge to be brought without any proof of any

'agreement,'" *id.* (Ground 5, second paragraph); (2) "contended they would prove

no agreement existed for any conspiracy," but then failed to do so; *see id.* (first and

third paragraphs); (3) "never proved the very issue he rose (sic), that no agreement

existed. In fact, the matter was not even addressed by counsel for the Petitioner,

even though this is the defense counsel claimed," *id.* at 9 (Ground 8, sixth part, if

numbered); and (4) "failed to have Petitioner testify, when he wanted to, to testify

he had no agreement with the other defendants," *id.* at 8 (Ground 5, second

paragraph). He further contends that appellate counsel failed to raise the issue of

ineffective assistance of counsel with regard to the sufficiency issues on direct

appeal. *See id.* (second paragraph).

Because all of these ineffectiveness claims hinge on assertions of

insufficiency of the evidence, I also recommend that they be found waived, even

though I have gone ahead and addressed some of them separately below. "Although

cloaked in the guise of an ineffective assistance claim, this is the same issue decided

on direct appeal and cannot be raised again in a § 2255 motion." *United States v. Anderson,* 17 Fed. Appx. 855, 858 (10th Cir. 2001).[8]

### E.   Claim Based Entirely On Mistaken Factual Premise

The attorney who represented Defendant at trial – Herman Ortiz – was appointed on May 14, 2002.  At that time, trial was scheduled for June 3, 2002.  *See United States v. Duran-Salazar,* CR 02-501 WJ (Docs. 29, 31).  On May 24th, Ortiz filed a motion for a continuance stating that he was newly-appointed and could not be ready for trial because he needed to "review the evidence and evaluate the case." *Id.* (Doc. 32).  I granted the motion that same day and rescheduled trial a month later – July 9, 2002 – on a trailing docket.  *Id.* (Doc. 33).

Toward the end of June, the United States moved for a definite trial setting. *Id.* (Doc. 35).  After one of the co-defendants moved to sever, *id.* (Doc. 35), Ortiz again moved for continuance, this time stating that he needed additional time to

---

[8]  *See also Reiter v. United States,* 371 F. Supp. 2d 417, 426 -427 (S.D.N.Y. 2005) ("It is well settled that federal prisoners may not use a Section 2255  motion to relitigate issues raised and addressed on direct appeal. . . .  If the same issue was raised and addressed on appeal in a slightly different form, it is considered raised and addressed."); *Wheeler v. United States,* 2006 WL 1155236 at *2 ("[Movant] cannot use a § 2255 proceeding, in the guise of ineffective assistance of counsel, to relitigate issues decided adversely to him on direct appeal."); *Clemons v. United States,* 2005 WL 2416995 at *2 (E.D. Tenn. 2005) ("The allegation that the government failed to prove the elements of the firearm conviction was raised and rejected on direct appeal.  "In sum, the evidence at trial was sufficient . . . .  Clemons cannot use a § 2255 proceeding, in the guise of ineffective assistance of counsel, to relitigate issues decided adversely to him on direct appeal.").

investigate and that there were unresolved discovery disputes with the
Government.  He did not indicate the nature of the discovery dispute and asked for
trial to be set in September 2002.  *See id.* (Docs. 38, 41).

The United States opposed the motion, and one of the other defendants
indicated that the dispute involved grand jury transcripts.  *See id.* (Docs. 41-43).
None of the pending motions were resolved prior to the July 8th docket call,
however, at that time "all parties" indicated that they were "ready to proceed" and
"announce[d] that they would go to trial." *Id.* (Doc. 47).  The defendants were not
severed, their attorneys proceeded to pick a jury and, due to the Court's calendar,
the trial was pushed back another two days.  *See id.* (Doc. 48).

Defendant claims that trial counsel was ineffective because he filed a motion
to continue just a few days before trial, which violated court-ordered deadlines.
Evidently, Defendant believes that his attorney was not given any extensions
because he violated the court order.  He further asserts that as a result of not
securing an extension, counsel was unprepared for trial.  *See Doc. 1* at 8 (Ground 4);
*id.* at 9 (Ground 8, part 1); *see also Doc. 9* at 10-11.

The record above, however, shows that he is entirely mistaken.  His attorney
was granted a one-month continuance, and the potential severance that appears to
have prompted the second motion for a continuance never materialized.  There

19

being no factual basis for the claim, I recommend that it be dismissed.  Furthermore, I separately address Defendant's related claims that counsel failed to investigate and was unprepared for trial below.

## F.  Claims Based On "Pretrial Publicity"

Defendant claims that the "advertisements put on television, in newspapers and magazines, and billboards, for 'Just Say No To Drugs,'" denied "his right to a impartial jury" because

> [j]ust less then one year prior to Petitioner's trial, the September 11, 2001 event happened at Twin Towers. Government, through propaganda, places ads across America that instruct Americans people that use drugs are "bad people."  During the time of Petitioner's trial, the ads showed that people who smoked, sold, manufactured, or [had] any manner of association with drugs, aided and abetted 'terrorism,' and were bad people.  These advertisements by the executive branch, the same branch that prosecutes drug cases, denied Petitioner a fair and impartial trial by people uninfluenced by the Government's propaganda.

*Doc. 1* at 10 (Ground 9).  He further claims that Ortiz was ineffective because he

> watched these ads on television, and never sought to have any voir dire issued to test the impartiality of the jurors mind set by seeing whether the ads substantially prejudiced them.  Since Congress has found ads target children for food products, the presumption exists the drug ads targeted people regarding drugs and denied a fair trial to the Petitioner.

*Id.; see also id.* at 9 (Ground 8) (Ortiz was ineffective because he failed "to challenge the advertisements that brainwashed the juror[s] of America and denied Petitioner his right of a fair trial"). I recommend that both claims be dismissed on the merits.

To establish a constitutional violation, Defendant bears the burden of showing juror partiality. *E.g., Goss v. Nelson,* 439 F.3d 621, 627 (10th Cir. 2006) (citing *Irvin v. Dowd,* 366 U.S. 717, 723 (1961)). Though Defendant submitted no evidence whatsoever, for the purposes of argument I will assume that the "Just Say No To Drugs" public service announcements were increased after September 11, 2001. Nevertheless, Defendant is mistaken that the jury pool was not questioned about whether they could be partial about the "drug war."

As noted before, Senior Judge Vela presided over the voir dire as well as trial in this matter. As is the practice in this District, he picked multiple juries during one session. As with the trial, defense counsel jointly participated in the voir dire. The question of juror perceptions about drugs is a question that, not surprisingly, is equally important to both the prosecution ***and*** the defense. In fact, voir dire questions submitted by the United States and one co-defendant both ask the judge to inquire about juror views on drugs.[9]

---

[9] *See United States v. Duran-Salazar,* CR 02-501 WJ (Doc. 39; U.S. question 4 – "Does the fact that the charge involves the importation of drugs – specifically cocaine and marijuana – make it difficult for any juror to decide the facts in this case? Does any juror feel that he or she

21

None of the three attorneys asked about the jurors' views on drugs because Judge Vela did so for them.  After asking the potential jurors about prior service on juries that revealed most had previously served on criminal drug cases, Judge Vela stated to the jurors:

> Look, this drug thing you'd have to close your eyes if you did not acknowledge and recognize that we have a very serious drug problem in the United States of America. We are the champion consumers of the world.  We'd have to close our eyes.  And all of us [are] aware of the fact that Washington is addressing it. Your capitol is Albuquerque? . . . Santa Fe. . . .  All right.  We know we have a problem.  And we address it all over.  We address it, you know, in Washington, in our state capitals, and locally and the like.  But something else about the way we try cases:   We do not allow ourselves to be influenced by a plague so much that we cannot be fair and impartial in a case involving a problem like drugs.  Just because we come in here with an idea that, God, we've got to do something, we just may not be fair and impartial jurors. So understand that some of these cases are going to involve, very likely, some kind of drugs.  It may be methamphetamines or maybe marijuana or cocaine or whatever.  Do any of you have that kind of problem by which you could not, in a case like that, be fair and impartial – and listen to this part very carefully – to the Government of the United States and to the defendant? Any problems there?

*Jury Selection Transcript* at 35-37; *see also id.* at 22-35 (fifteen potential jurors served

---

could not decide fairly a case involving such a large amount of drugs?"); *id.* (Doc. 37; Garcia question "Do you feel that there is a slight possibility that your feelings about drugs might cause you not to be completely fair and open-minded in deciding this case?").

on juries before; ten cases were criminal drug cases).

No juror responded at that time to the judge's question. Later, one juror indicated that "I in all conscience feel if these drug cases are personal-use cases, I would have a problem. . . . If they're gifting, giving, wholesale or retail, I don't have a problem." *Id.* at 49. The judge replied that "when the cases are announced and we tell you what the particulars are, you'll get more information in that regard. And you can certainly reveal what your feelings are at that time. . . . Don't hesitate – they'll be grateful for you – to you for that, actually, if you tell them exactly how you feel about that." *Id.* at 49-50. This person did not serve on the jury. *See id.* at 109. No potential juror indicated that he or she could not be impartial in a case involving drugs. *See id.* at 73-92.

If as in *Goss,* Duran is contending that the public service messages about drugs is so pervasive that prejudice is presumed and that no jury in the United States could give a fair trial, the argument should be rejected. Prejudice will not be presumed unless pretrial publicity about the case "'created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial'" and a defendant establishes "'an irrepressibly hostile attitude pervaded the community' [rather than] '[s]imply showing that all the potential jurors knew about the case and that there was extensive pretrial

23

publicity.'"  *Goss,* 439 F.3d at 628-29 (quoting *Hale v. Gibson,* 227 F.3d 1298, 1332 (10th Cir. 2000)).

Here there was no pretrial publicity about this particular case, and the jurors all indicated that they could be impartial in a case involving drugs.  Thus, the case does not present the rare or extreme circumstances where "pretrial publicity" will be deemed to have entirely displaced the judicial process.  *Id.* at 628-30.

### G.  Claims Regarding Evidence At Trial

#### 1.  Videotape

Agent Shank did not record what he saw using the infrared equipment on the night in question.  The United States did, however, have a video recording of "some activity that the [infrared equipment] picked up, not on January 12, 2002."  *Trial Transcript* at 39.   Agent Shank had prepared the video in anticipation of showing it at trial, *id.* at 247-49, and the United States wanted to play the video during Agent Shank's testimony on direct "[j]ust as an example of how the [infrared equipment] operates and exactly what Agent Shank sees when he looks at the monitor."  *Id.* at 40.  Collectively defense counsel objected because the United States had not disclosed it under FED. R. CRIM. P. 16 prior to trial.   *Id.* at 40, 55-56.  Judge Vela asked Agent Shank whether the conditions on the video are "the same or similar to

the night in question," to which he replied "yes," and admitted the tape into

evidence subject to defense counsel viewing it first.  *Id.* at 93.

As it turned out, the videotape was not an "exact" example of what Agent

Shank saw on January 12, 2002, because it was taken on a different day and at 7:30

in the evening as opposed to 3:00 in the morning.  Before the United States played

the tape for the jurors, it asked Agent Shank to explain that the videotape they

were about to see was not made on the night in question and that the thermal

images they were going to see in court would be fainter than what Agent Shank

would have been able to observe on the night in question.  Judge Vela asked Agent

Shank the same sorts of questions when the videotape was playing, clarifying that

the images were fainter than what he would have seen.  *See id.* at 232, 235-37.

Defendant claims that the admission of the videotape violated FED. R. CIV. P.

16 and the "Fifth and Sixth Amendments" because the

> Government waited until trial to give notice of a
> videotape it intended to have admitted.  A generalized
> request for discovery was set forth by trial counsel.  The
> district court, contrary to Rule 16's mandate government
> must continue to turn over and notice defense of
> discovery it intends to use or that would affect the case.
> The court, contrary to the Rule's mandate to have
> ongoing duty to disclose, denied counsel's request to
> refuse introduction.

*Doc. 1* at 7 (Ground 3).

Section 2255 does not provide a remedy for every violation of federal law, and "collateral relief is not available when all that is shown is a failure to comply with the formal requirements of [a federal criminal] Rule." *United States v. Timmreck,* 441 U.S. 780, 784 (1979).  Instead, it is well-settled that "an error of law [or fact] does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Addonizio,* 442 U.S. 178, 185 (1979) (quoting *Hill v. United States,* 368 U.S. 424, 428 (1962)); *see also, e.g., United States v. Gordon,* 172 F.3d 753, 754 (10th Cir. 1999); *United States v. Talk,* 158 F.3d 1064, 1069 (10th Cir. 1998); *United States v. Blackwell,* 127 F.3d 947, 953 -954 (10th Cir. 1997); *United States v. Gattas,* 862 F.2d 1432, 1434 (10th Cir. 1988).[10]

 "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one; as the [Supreme] Court wrote recently, 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded.'" *Weatherford v. Bursey,* 429 U.S. 545, 559 (1977) (internal citation omitted).  Not surprisingly, then, I have been unable to find any decision that holds

---

[10]  The principle is the same for state convictions — evidentiary rulings do not provide the basis for habeas relief unless an error is so "grossly" prejudicial and "fatally" infected the trial that the proceedings were "fundamentally unfair" and denied due process. *See, e.g., Harris v. Poppell,* 411 F.3d 1189, 1198 (10th Cir. 2005); *Wafford v. Evans,* 198 Fed. Appx. 782, 785 (10th Cir. 2006) (and cases cited therein).

a Rule 16 violation constitutes the sort of "fundamental defect" for which habeas relief could be granted.

Here, by questioning Agent Shank about the videotape, collectively defense counsel were able to establish or underscore that:  he did not know whether the tape was made with the same infrared unit he was looking at on the date in question; he was not careful about the tape he did make; he could not distinguish how many people are present if a group of them bunches together; his view of the area through the monitor was limited and there were things or areas he could not in fact see; he could not be certain whether an image he was looking at was a dog, a bush, or a person; and he contradicted himself on whether bushes emanate heat and whether heat-emanating objects become lighter or darker as the night progresses. *See Trial Transcript* at 252-267.  In their closing arguments, counsel stressed the factors they were able to establish because of the deficiencies of the videotape, which supported their theory that the men had crossed illegally and were hiding in the bushes by the train tracks when they happened to be apprehended near an area where drugs had been dropped and people scattered.  *See id.* at 420-44.

Videotape illustrations or "examples" can be admitted into evidence.  *See, e.g., Robinson v. Missouri Pacific R. Co.,* 16 F.3d 1083, 1087-88 (10th Cir. 1994); *Christopher B. Mueller & Laird C. Kirkpatrick,* 5 FEDERAL EVIDENCE § 532 (2d ed.).

But even if it was error, for example, to allow the prosecution to introduce the tape, not give a limiting instruction, and/or allowing the jurors to play the tape during deliberations, *see, e.g., Partial Trial Transcript* at 3, any such error does not warrant relief under § 2255.  Defense counsel were "not denied the opportunity to challenge the admissibility of the evidence, nor was their ability to impeach its effectiveness impaired." *United States v. Wilcox,* 640 F.2d 970, 974 (9th Cir. 1981) (evidence procured in violation of FED. R. CRIM. P. 41(a) warrant requirement that "prejudiced [defendants] insofar as it supported the government's cases against them" not grounds for § 2255 relief).

A state habeas case with similar facts is illustrative.  There the prosecution introduced "two videotapes that illustrated the testimony of the state's expert witness [and] supported the state's theory and undermined [Defendant's] theory of self-defense" in a murder case where defendant received a life sentence.  *Harris v. Poppell,* 411 F.3d 1189, 1190 (10th Cir. 2005).  The Tenth Circuit acknowledged the concern that because there were no eyewitnesses to a killing, the crime scene had not been preserved, the key issue was whether the defendant acted in self defense, and there was no limiting instruction given, the videos possibly could have influenced the jury.  It also recognized that staged video recreations by one party pose "not only . . . the danger that the jury may confuse art with reality . . . but the

28

impressions generated by the evidence may prove particularly difficult to limit." *Id.*

at 1197 (internal quotations and citations omitted).  Nonetheless, the Tenth

Circuit could not

> conclude that the alleged error in the . . . evidentiary
> ruling "was so grossly prejudicial that it fatally infected
> the trial and denied the fundamental fairness that is the
> essence of due process." . . .  We agree with the district
> court's analysis that the two videos were relevant and had
> evidentiary support for their introduction.  Mr. Harris had
> adequate trial opportunity to challenge the evidentiary
> underpinnings and possible inferences drawn from the
> videos. . . .  Finally, . . . Mr. Harris was not absolutely
> barred from asserting self-defense with regard to the
> murder; indeed, he presented evidence and called his own
> expert witness in support of his theory.

*Id.* at 1198.

The present case has all of those factors and is even more compelling for

finding no "fundamental defect" that resulted in a "complete miscarriage of justice"

because here the infrared monitor demonstration was not an attempt to recreate

what no one observed.  Therefore, I recommend that the claim be denied.

Defendant also claims that appellate counsel was ineffective for failing to

raise the videotape issue on appeal.  *See Doc. 1* at 7 (Ground 3, second part).  Given

the above discussion, however, he cannot establish the requisite prejudice under

*Strickland.*  Therefore, I recommend that this claim be denied too.

29

## 2.  Right To Testify

As discussed above, Defendant waived his sufficiency of the evidence and the ineffectiveness claims associated with it.  However, one of these associated claims is based on a constitutional guarantee separate from sufficiency — the right of a defendant to testify.  Therefore, I address the ineffectiveness claims associated with this right separately.

During voir dire, Ortiz asked Judge Vela to question the panel about any bad experiences they may have had with illegal immigrants, which he did:

> MR. ORTIZ:   If I may, Your Honor, my client will be testifying  –
> THE COURT: Yes, sir.
> MR. ORTIZ:  – and he will be explaining to the jury that he crossed over illegally, searching for work.
> THE COURT: Okay. You're asking about illegal status?
> MR. ORTIZ: Exactly, if anybody has any bad experiences.

*Jury Selection Transcript* at 83.  In his opening statement, Ortiz again told the jurors that his client would be testifying and telling them how he had crossed the border illegally as he had done before looking for construction work, did not know the other defendants, and was just "at the wrong place at the wrong time."  *Trial Transcript* at 28; *see also id.* at 27.  At the close of the case, however, Defendant did not testify, and Ortiz stated that his defense was "closed" without any further discussion.  *See id.* at 380.  Judge Vela then instructed the jurors that

30

> as you noticed in this case, for whatever reason, the
> defendants chose not to testify.  That's a circumstance
> that cannot be used against them.  You cannot go into the
> deliberation room and ask yourself, "Why didn't they
> testify?" because you would be using that circumstance
> against them.  Simply put:  They don't have to testify, and
> you can't use it against them.

*Id.* at 392.

Defendant asserts that even though Ortiz mentioned lack of an agreement in

his opening argument, he did not then "prove" an absence of an agreement because

he "failed to have Petitioner testify, when he wanted to, to testify that he had no

agreement with the other defendants."  *Doc. 1* at 8 (Ground 5, second part); *see also*

*id.* at 9 (Ground 8).  Defendant does not elaborate on the circumstances under

which he was allegedly prohibited from testifying.  I note that in his subsequent

motion to withdraw, Ortiz stated that he "prepared [Defendant] for trial and for his

testimony" and Defendant "ultimately decided at trial at the close of the

government[']s case that he would not testify."  *United States v. Duran-Salazar,* CR

02-501 WJ (Doc. 55).  Ultimately, however, whatever factual basis Defendant may

assert would not change the dispositive fact that the record before me contains.

It is true that a criminal defendant has a constitutional right to testify in his

own behalf at trial.  *E.g., Rock v. Arkansas,* 483 U.S. 44, 49-52 (1987).  It is equally

true that the decision whether to do so is the defendant's and not his attorney's.

31

Although an attorney "should inform the defendant that he has the right to testify

and that the decision whether to testify belongs solely to him [and] should also

discuss with the defendant the strategic implications of choosing whether to testify,

and should make a recommendation to the defendant," defendant's counsel has no

authority to "prevent a defendant from testifying in his own defense, even when

doing so is suicidal trial strategy." *Cannon v. Mullin,* 383 F.3d 1152, 1171 (10th Cir.

2004).  However,

> [a] trial court has no duty to explain to the defendant . . .
> that he has a right to testify or to verify that a defendant
> who is not testifying has waived the right.  *See United
> States v. Ortiz,* 82 F.3d 1066, 1069-70 n.8 (D.C. Cir.
> 1996) (collecting cases); *c.f., United States v. Janoe,* 720
> F.2d 1156, 1161 (10th Cir. 1983).  To ensure his
> constitutional rights, "a defendant must alert the trial
> court that he desires to testify or that there is a
> disagreement with defense counsel regarding whether he
> should take the stand." *United States v. Webber,* 207 F.2d
> 545, 550 (6th Cir. 2000) (quotation omitted); *Janoe,* 720
> F.3d at 1161 n.9 (holding that right to testify not denied
> where, *inter alia,* "defendant made no objection to his
> attorney's statements that defendant would not testify and
> made no request to testify").  "When a defendant does
> not alert the trial court of a disagreement [with his
> counsel regarding his right to testify], waiver of the right
> to testify may be inferred from the defendant's conduct."
> *Webber,* 207 F.3d at 550.

*United States v. Williams,* 139 Fed. Appx. 974, 976  (10th Cir. 2005).  Here, the

record supports Ortiz's contention that Defendant chose not to testify, because at

no time did he inform the trial court that he wanted to testify, much less that he was prohibited from doing so.[11]  I find that under the reasoning of *Williams* and *Janoe,* that Duran cannot establish a right to testify claim as a matter of law. Without a viable right to testify claim, the ineffectiveness claims that rest on such a violation also fail.

Nevertheless, even if Ortiz "ignored his desire to testify, and thus rendered ineffective assistance [Defendant] must still show prejudice [that is a] reasonable probability exists that [his] proposed testimony would have altered the outcome of his trial." *Williams,* 139 Fed. Appx. at 977.  I find that there is no possibility that the testimony would have effected the outcome of the trial because the substance of

---

[11]  *See, e.g., Underwood v. Massie,* 75 Fed. Appx. 747, 749 (10th Cir. 2003) ("the transcript does not support petitioner's assertion that her trial counsel prevented her from testifying.  The transcript indicates that her trial counsel announced in open court at the close of the state's case that he would not be calling petitioner to testify.  The record does not reflect any objection by petitioner to this assertion at the close of the state's case, nor does it indicate she raised any objection at the close of the defense case or at any other time."); *c.f., Cardenas v. United States,* 2005 WL 2416025 (W.D.N.C. 2005) ("Significantly, Petitioner does not assert that after he and counsel discussed whether or not he should testify he still maintained that he wished to testify. Indeed, the contemporaneous evidence supports a conclusion that Petitioner did not disagree with his counsel's advice not to testify.  For instance, Petitioner did not object at trial when his counsel announced that the defense rested and would call no witnesses. (Tr. Trans. p. 309). Moreover, at his sentencing hearing, when given an opportunity to address the Court, Petitioner did not state that he had not been permitted to testify or that he had wanted to testify but counsel did not allow him to do so.  Rather, he stated "[u]nfortunately, I didn't have a chance to get on the stand to let you know my side of the story." (Sent. Hearing Trans. p. 31).  This statement does not evince a desire on the part of Petitioner to testify at trial wherein his will to do so was overcome by intransigence on the part of his lawyer. Petitioner and his counsel made a tactical decision that Petitioner should not testify.  It thus appears to the Court that counsel's advice persuaded Petitioner that it was in his best interest not to testify.").

that testimony was in fact plainly before the jury.  All three attorneys pursued the same defense, and their coordinated cross-examination and presentation of one witness continually impressed upon the jurors their position on the facts that they argued both in opening and closing statements.  Thus, I recommend that these claims of ineffectiveness be denied on the merits because Defendant fails to establish prejudice.

For the same reasons, I recommend that his associated claim – that appellate counsel was ineffective for failing to raise these issues on appeal – also be denied for lack of the requisite prejudice.  *See Doc. 1* at 8 (Ground 5, second part).

## H.  Claims Based On Weight Of The Drugs

The claims Defendant raises in this regard fall into two categories – ineffectiveness at the trial level for failure to reweigh the drugs, and the retroactive applicability of cases that post-dated the trial.  They are distinct but related claims, and to put them in context it is necessary to discuss the same background facts. Therefore, I group them together here, and start with the ineffectiveness claims.

### 1.  Ineffectiveness At Trial Level For Failure To Re-Weigh The Drugs

*a.  Apprendi Followed.*  The Supreme Court decided *Apprendi* in 2000 and held "[o]ther than the fact of a prior conviction, any fact that increases the penalty

for a crime beyond the prescribed statutory maximum must be submitted to a jury,
and proved beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 490
(2000). Although *Apprendi* involved a state decision, the Tenth Circuit
subsequently held it applicable to federal cases and that drug quantities were to be
treated as elements of the offense and pleaded in the indictment. *See United States
v. Jones,* 235 F.3d 1231, 1235-36 (10th Cir. 2000).

This case commenced in 2002 and complied with *Apprendi.* The criminal
complaint specified the amount of cocaine and marijuana seized, and the
subsequent indictment did so as well. The jurors were instructed that the United
States had to prove quantity as part of its case. *See United States v. Duran-Salazar,*
CR 02-501 WJ (Docs. 1, 23, 50-52); *Trial Transcript* at 403-05, 451-52. They were
given a copy of the indictment during deliberations, *see Trial Transcript* at 388, and
their separate verdict forms for each defendant required findings whether the
defendant was "involved" with "more" or "less" than "5 kilograms of cocaine, and/or
. . . 50 kilograms (110 lbs.) of marihuana."[12] They found each defendant was

---

[12] The 110 pounds of marijuana minimum listed in the indictment technically would have been
less than the fifty kilograms. *See Weight Conversion* ("110 Pound(Lb)= 49.89516 Kilogram"); *see also
United States v. Duran-Salazar,* CR 02-501 BB (Doc. 23 at 2-3) (charging violation of 21 U.S.C.
§ 960(b)(3) that carries a maximum penalty of twenty years for unspecified quantities of marijuana, rather
than 21 U.S.C. § 960(b)(4) that places a statutory maximum of five years for less than 50 kilograms of
marijuana.

involved with "more" than the stated amounts.  *See United States v. Duran-Salazar,*

CR 02-501 WJ (Docs. 50-52).

As of trial in July 2002, although the jurors were required to find the

quantities alleged in the indictment, the trial judge still retained the authority to

pinpoint the exact quantity of drugs to calculate the sentence under the Sentencing

Guidelines, and *Apprendi* would only come into play if the sentence exceeded the

statutory maximums.  Thus, during Defendant's trial, Judge Vela asked questions to

clarify the quantities involved.

**b.  *Defendant Assertions.***  Defendant claims that his first appointed attorney

and Ortiz were ineffective because they did not have the drugs independently

reweighed before they were destroyed "where the weight difference, with and

without wr[a]ppings, could affect his term of inc[arc]eration" and

> allowed government to destroy evidence without seeking
> any additional reweigh.  The weight of the materials, the
> closeness of the amount to the weight factor for
> additional time in prison, counsel should have sought
> reweigh.  Average for a package of substance, is from 10%
> or more for packaging weight.  Given this, the substance
> weight would have weighed less then:  57 lbs for cocaine,
> placing in under the 15 kilogram limit, for level 32,
> making the term of incarceration substantially less.

*Doc. 1* at 7 (Ground 2) (regarding first appointed attorney Matthew Bradburn); *see*

*also id.* at 9 (Ground 8) (Bradburn was ineffective for failing to "investigate the

substance, obtain finger prints, and reweigh the substances to insure accuracy in weight so the sentencing portion would be correct"); *id.* at 9 (Ground 8) (trial counsel Ortiz "entered trial unprepared, without . . . obtaining all necessary discovery").

Next, evidently referring to the weight of the drugs, Defendant claims that "[f]acts used to enhance Petitioner were not found by a jury" in violation of *Booker*, and that "the difference in sentencing is plain error and prejudicial and he must be resentenced." *See Doc. 1* at 7 (Ground 1).

Having reviewed the record in minute detail, I recognize that throughout these proceedings various quantities of drugs were discussed and the quantities were not always consistent. However, I cannot conclude that counsel was ineffective for failing to have the drugs reweighed for three reasons.

### c. First, The Cocaine Was Weighed Without The Packaging. With respect to the cocaine, Defendant is mistaken. According to the testimony at trial, the DEA laboratory received the entire amount of cocaine and weighed it without the wrappings.

Border Patrol Agent Freeman responded to Agent Shank's directions and was the first to come across Garcia and the six bags. The bags were emptied in his presence and his report noted the contents. *See Trial Transcript* at 127, 133-35,

142, 186-87.  The two smaller "nylon" "gym" bags each contained ten individually-
wrapped "packages" or bundles of cocaine that together weighed approximately 51
pounds.  *Id.* at 186, 188-89; *see also id.* at 276 (Border Patrol Supervisory Agent Jose
Gutierrez testimony).  The complaint therefore asserted that the agents seized
"approximately . . . 51 pounds."  *United States v. Duran-Salazar,* 02-4044M (Doc. 1);
*see also* www.asknumbers.com/WeightConversion.aspx (hereinafter "*Weight
Conversion*") ("Fifty-one pounds equals 23.13321 kilograms.").  The indictment,
however, needed to only allege a five-kilogram minimum to ensure the case fell
within the statutory penalty for a minimum sentence of ten years.

DEA agents took possession of the cocaine bundles from Border Patrol and
weighed and tested them.  In Las Cruces, the first DEA agent also found the
cocaine weighed approximately fifty-one pounds overall.  This agent was asked to
identify the "net" weight of cocaine, and he said "approximately 23.7 kilograms,"
but in context it is clear that "net" weight meant the twenty "packages" that had
been taken out of the bags, and not the net weight of the cocaine itself.  *See Trial
Transcript* at 313-316 (Agent Gary Apodaca who took custody in Las Cruces).

However, the DEA agent who later tested the content of the twenty
packages to see whether they indeed contained cocaine noted that each "package"
was a "brick[] of compressed white powder, wrapped [with] two vacuum-sealed bags

38

wrapping around them, and also they were wrapped with tape and plastic and carbon paper and dryer sheets." *Id.* at 342 (Agent Kent Glanville); *see also id.* at 346-47. This agent clarified for Judge Vela that he also weighed the cocaine to determine "net weight," or weight "without packaging," and determined it was "20.09 . . . ***no . . . 20.01 kilograms . . . [a]bout 44 pounds.***" *Id.* at 348 (emphasis added); *see also Weight Conversion* ("20.01 Kilogram= 44.11449 Pound(Lb)").

Thus, the multiple packaging materials around each brick of cocaine accounted for 2.69 kilograms or about 11% of the total weight of the twenty bundles, and Defendant's estimate of 10% for wrappings is fairly accurate. However, the weight of the cocaine at trial already in fact took into account the percentage that Defendant wants this Court to use. *C.f., United States v. Clonts,* 966 F.2d 1366, 1371 (10th Cir. 1992) (rejecting argument that sentence based on improper calculation where Customs Service Agent allowed 8% as packaging for marijuana covered in cellophane and heavier contact paper).

### d. Second, Defendant's Estimation Of The Weight Of The Packaging Does Not Effect The Guideline Calculations.

Unlike the cocaine, I cannot find that the trial testimony established the net weight of the marijuana.[13] However, even using

---

[13] The other four bags found by Border Patrol were described as a "larger" black gym bag, two "grey mail bags," and a "green duffle" bag, and those contained the marijuana. *See Trial Transcript* at 189-91. Like the cocaine, the marijuana too was pressed into "bricks" and

Defendant's asserted percentage for wrappings, there would be no difference in the

outcome.  Thus, Duran cannot establish prejudice.

Judge Vela made his findings as to quantity right after closing arguments

while the evidence was still fresh, subject to later objection.  *See Trial Transcript* at

457-58.  For the cocaine, he determined that the second DEA agent's testimony of

20.01 kilograms controlled, but mistakenly recalled the testimony as 20.9 kilograms.

*See id.* at 459 ("I don't remember evidence indicating anything else other than the

fact that there was 20.9 kilos of cocaine.").  Subsequently, there were no objections

to the portions of the presentence report, which itself mistakenly thought Judge

_____

individually wrapped, though not with as many different wrappings of the cocaine bricks –
"wrapped in brown cellophane tape" packages or bundles.  *Id.* at 191; *see also id.* at 314.  The
complaint asserted that the Border Patrol Agents seized "approximately 159 pounds of
Marijuana," which converts to approximately 72 kilograms.  *See United States v. Duran-Salazar,*
02-4044M (Doc. 1); *Weight Conversion* (159 Pound(Lb)= 72.12118 Kilogram).  The indictment,
however, needed to only allege the more than "50 kilograms" to ensure the case would not fall
within the five-year statutory maximum penalty provision.  *See* 21 U.S.C. § 960(b)(4).

Again, the DEA took custody of the marijuana and weighed it, and when the first DEA
agent was asked to identify the "net" weight of seventy-three marijuana bundles he said
"approximately 69.1 kilograms [which converted to] about 153 pounds."  *Id.* at 315; *see also id.* at
314; *Weight Conversion* ("69.1 Kilogram= 152.33942 Pound(Lb)").  The DEA took a picture of
the marijuana being weighed, which was later introduced at trial.  *See id.* at 318-19.  Thus, the
seven-pound weight difference between the Border Patrol weight and the DEA weight, appears to
be due to the bundles being taken out of the bag, but not the cellophane being removed.  Indeed,
the representative samples received by the DEA still contained the cellophane.  The DEA did not
send all 73 bundles to the DEA lab for chemical analysis.  It only sent a representative sample of
"10 Ziplock bags" of "compressed green plant material" or "bricks" that indeed tested positive as
marijuana.  *Id.* at 341; *see also id.* at 322, 345.  The rest of the seized bricks were destroyed
sometime before trial, and there was no trial testimony about the net weight of the marijuana
without the cellophane packaging on each bundle.

Vela found "20.08 kilograms" of cocaine and used that for the calculations. *See Presentence Report* at ¶ 19.

As for the marijuana, again Judge Vela made findings as to quantity right after closing arguments and determined that "there was 150 pounds of marijuana involved," which would have translated to 68 kilograms. *See Trial Transcript* at 459; *Weight Conversion* ("150 Pound(Lb)= 68.03885 Kilogram"). Subsequently, there were no objections to the portions of the presentence report, which mistakenly used "69.1 kilograms" of marijuana as Judge Vela's trial findings. *See Presentence Report* at ¶ 19.

The Sentencing Guidelines at the time divided penalty gradations based on whether the drugs involved gram quantities or kilogram quantities, and to calculate the quantities, cocaine was to be "converted" to a "marijuana equivalency."[14] The Guidelines called for adding the "marijuana equivalency" of the cocaine to the amount of the marijuana for a total "marijuana" quantity. Both 20.01 and 20.08 of cocaine yield the same "marijuana equivalency" that the Guideline range used in the presentence report.[15]

---

[14] *See* 2001 FEDERAL SENTENCING GUIDELINE MANUAL, § 2D1.1; *Presentence Report* at ¶ 18 ("the 2001 edition of the guideline manual was applied").

[15] Following Application Note 10 to § 2D1.1 of the 2001 version, the presentence report found that "20.08 kilograms of cocaine converts to 4,016 kilograms of marijuana [and under]

Likewise, 69.1 kilograms versus 68 kilograms of marijuana does not alter the total amount of "marijuana" such that a lower Guideline range should have been used. In either case the total still fell between the 3,000 and 10,000 kilogram range for a base level of thirty-four.[16]

Even assuming that, like the cocaine, the marijuana wrappings constituted 11% of the overall weight, the result is the same. Subtracting 11% from 68 kilograms of marijuana still yields 61.2 kilograms and the total kilograms would be lowered to only 4077.2 kilograms, which still falls between the 3,000 and 10,000 kilogram level.

Finally, even using Defendant's estimate of 10% packaging materials from the lowest possible kilogram calculation — 4077.2 — the total amount of kilograms would still fall more than a thousand kilograms beyond the minimum threshold. Thus, Defendant's mathematical assertion would not result in a weight calculation that would have lowered the applicable Guideline range, and he cannot establish the

_____

2D1.1(c)(3), [and] if the instant offense involved between 3,000 but less than 10,000 kilograms of marijuana the base offense level is thirty-four." *Presentence Report,* ¶ 19 ( *see also Sentencing Guidelines,* § 2.D1.1 (2001) (Application Note, 1 gram of cocaine = 200 grams of marijuana); *c.f., Weight Conversion* ("20.01 Kilogram= 20010 Gram" x 200 = 4,002,000 grams or 4002 kilograms, which falls above the 3,000 kilogram threshold).

[16] Adding the "marijuana equivalency" of the cocaine — 4,016 kilograms — to the amount of the marijuana — either 69.1 kilograms or 68 kilograms — is a total of either 4,085.1 or 4,084 — well above the 3,000 kilogram threshold.

requisite prejudice.[17]

    ***e. Third, The Sentence Imposed Did Not Exceed A Statutory Maximum.***  In November 2003, Judge Johnson overruled a motion requesting a downward departure for minimal participation and, there being no other defense objections to the presentence report, sentenced Defendant to 151 months on each count, the lowest end of the applicable Guideline range.[18]  *See United States v. Duran-Salazar,* CR 02-501 WJ (Docs. 82, 109, 113).  The sentences were to run concurrently for a total of 12.5 years incarceration.  *Id.*  (Docs. 109, 113); *see also Sentencing Transcript* (11/2/03).

    The penalty structure for importation offenses both when Duran was indicted and now, is virtually "identical [to the] quantity-based punishment scheduled

---

    [17]  *See United States v. Zabalza,* 189 Fed. Appx. 735, 737 (10th Cir. 2006) (defendant argued counsel was ineffective because if marijuana had been weighed without 11% packaging materials he would have received a lower sentence, but using defendant's percentage district court found result would have been the same and Tenth Circuit refused to entertain a higher percentage on appeal as "little more than hopeful speculation"); *United States v. Lipp,* 2000 WL 745343 (10th Cir. 2000) (even if counsel was deficient with regard to weight of marijuana, even using lesser weights there was no prejudice).

    [18]  The presentence report assessed a total offense level of thirty-four, without any adjustment for acceptance of responsibility, and a criminal history category of I.  The resulting Guideline range, both under the 2001 version and the 2003 version in effect at the time of sentencing, was 151-188 months.  Defendant was asking to be given an offense level reduction of seven levels to a base level of twenty-seven, the same level defendants who had pleaded and not gone to trial received.  That would have put him in an overlapping Guideline range of 130-162 months.  *See, e.g., United States v. Duran-Salazar,* CR 02-501 WJ (Doc. 82); 2001 Sentencing Guidelines, Ch. 5 (Sentencing Table); 2003 Sentencing Guidelines, Ch. 5 (Sentencing Table).

[under] 28 U.S.C. § 841 [for possession with intent to distribute]." *United States v. Doe,* 297 F.3d 76, 83 (2nd Cir. 2002). That is, for "five kilograms or more" of cocaine with no resulting injury, the statutory penalty is a minimum of ten years and **maximum of life** imprisonment. *See* 21 U.S.C. § 960(b)(1) (2002); *id.,* § 841(b)(1)(A). For unspecified quantities of marijuana, the statutory **maximum is twenty years**. *See id.,* § 960(b)(3); *id.,* 841(b)(1)(C). Defendant's sentence does not exceed either of these statutory maximums.

It is true that for cases involving less than 50 kilograms of marijuana, the statutory maximum is five years. *See id.,* §960(b)(4); *id.,* § 841(b)(1)(D). However, even by a generous calculation of 11% packaging from the lowest marijuana weight found in this record — 68 kilograms — the weight would not fall below the fifty-kilogram threshold. (68 x 11% = 7.48 = total of 60.52 kilograms).

## 2.  *Booker* Error

**a.  *Booker* Applies To Cases Pending On Direct Review, But Was Not Applied In Defendant's Case.** Well after Defendant was sentenced and while his case was on direct appeal, the Supreme Court decided *Blakely* on June 24, 2004, and extended the rationale of *Apprendi* to a state sentencing scheme. *See Blakely v. Washington,* 542 U.S. 296 (2004). Defendant's appellate attorney did not raise a claim based on *Blakely,* even though he received an extension on briefing after

44

*Blakely* was decided. *See, e.g., United States v. Duran-Salazar,* No. 03-2313 (10th Cir. docket sheet, available through PACER – www.pacer.psc.uscourts.gov); *Defendant-Appellant's Opening Brief* at 5-8 (available at 2004 WL 3634611, filed September 22, 2004).

The Supreme Court then decided *Booker* on January 12, 2005. *See United States v. Booker,* 543 U.S. 220 (2005); *Duran-Salazar,* 123 Fed. Appx. at 946 (decided February 23, 2005). *Booker* extended the rationale of *Apprendi* and *Blakely* to the federal sentencing guidelines. Thus, a trial judge could not pinpoint quantities for sentencing purposes beyond what was found by the jury, without running afoul of the Sixth Amendment. To "remedy the constitutional infirmity," however, the Supreme Court made the federal sentencing guidelines advisory." *Cunningham v. California,* ___ S. Ct. ___, 2007 WL 135687 at * 13 (2007).

Neither *Blakely* nor *Booker* apply retroactively to cases that were final by the time they were decided and, thus, collateral relief is not available under § 2255 for such cases. *E.g., United States v. Price,* 400 F.3d 844, 845 (10th Cir. 2005); *United States v. Bellamy,* 411 F.3d 1182, 1184 (10th Cir. 2005). However, by its express terms, the *Booker* decision applies to "all cases on direct review," even though relief may not be available for all such cases:

As these dispositions indicate, we must apply today's

45

> holdings – both the Sixth Amendment holding and our
> remedial interpretation of the Sentencing Act – to all
> cases on direct review. . . .  That fact does not mean that
> we believe that every sentence gives rise to a Sixth
> Amendment violation.  Nor do we believe that every
> appeal will lead to a new sentencing hearing.  That is
> because we expect reviewing courts to apply ordinary
> prudential doctrines, determining, for example, ***whether
> the issue was raised below*** and whether it fails the
> "plain-error" test.  It is also because, in cases not
> involving a Sixth Amendment violation, whether
> resentencing is warranted or whether it will instead be
> sufficient to review a sentence for reasonableness may
> depend upon application of the harmless-error doctrine.

*Booker,* 543 U.S. at 268; *see also, e.g., United States v. Lee,* 196 Fed. Appx. 719, 722

(10th Cir. 2006) ("The holdings in *Blakely* and *Booker* . . . apply only to pending

cases or cases on direct review when the decisions were issued.").

   *Booker* was issued just two days before oral argument was scheduled in

Defendant's direct appeal.  Appellate counsel "attempted to raise a claim under it

via a Rule 28(j) letter [but] the 10th Circuit refused to consider any such issues."

*Duran-Salazar v. United States,* No. 04-10687 (petition for writ of certiorari at 7,

filed June 23, 2006); *see also United States v. Duran-Salazar,* No. 03-2313 (10th Cir.

docket sheet, oral argument held January 14, 2005).  Evidently the Tenth Circuit

refused to consider Defendant's *Booker* claim because counsel sought to raise it in a

Rule 28(j) letter rather than in a supplemental brief.  *See, e.g., United States v.*

*Higdon,* 418 F.3d. 1136, 1145-47 (11th Cir. 2005) (Circuit Judge Tjoflat's dissent

from denial of rehearing *en banc,* discussing various approaches in the Circuits);

*United States v. Levy,* 391 F.3d 1327, 1345-36, nn. 15-16 (11th Cir. 2004) (same); *see*

*also United States v. Dazey,* 403 F.3d 1147, 1173 (10th Cir. 2005) (addressing *Booker*

claim where counsel was granted permission to file a supplemental brief to raise

*Blakely* argument).

In the petition for certiorari to the Supreme Court, counsel also argued that

*Booker* required a resentencing hearing because (1) the jury did not find the

quantities that were used in computing his sentence, and (2) the sentencing judge

applied the Guidelines as mandatory whereas "under an advisory guideline system

[Defendant] would have been eligible for the minimum 120 month sentence

required by 28 U.S.C. § 960(b) [the statutory minimum of ten years for five

kilograms or more of cocaine] which is significantly lower than the sentence

received." *Id.* However, the Supreme Court denied certiorari and did not remand

in light of *Booker. See Duran-Salazar v. United States,* 126 S. Ct. 164 (2005)

("Petition for writ of certiorari to the United States Court of Appeals for the Tenth

Circuit denied. The Chief Justice took no part in the consideration or decision of

this petition.").

  ***b.  Two Types of Booker Error & Standards Of Review.***  There are two sorts

of *Booker* error — "constitutional" and "nonconstitutional." Constitutional *Booker* error refers to the Sixth Amendment violation — the judge finding facts to enhance a sentence beyond that found by the jurors. Nonconstitutional *Booker* error refers to applying the guidelines as mandatory. *E.g., United States v. Gonzalez-Huerta,* 403 F.3d 727, 731-32 (10th Cir.), *cert. denied,* 126 S. Ct. 495 (2005).

If the Tenth Circuit had addressed the *Booker* claim on direct review or if the Supreme Court had remanded the case, the standard of review would have been "plain error" because *Blakely* and *Booker* were decided while the case was on direct appeal, and therefore counsel could not have raised the claim in the trial court. *See Gonzalez-Huerta,* 403 F.3d at 732 (nonconstitutional *Booker* claim in that posture reviewed for plain error); *United States v. Dazey,* 403 F.3d 1147, 1174 (10th Cir. 2005) (constitutional *Booker* claim in that posture reviewed for plain error). I will assume that the plain error standard should apply for cases in the same procedural posture, but where the issue is before the Court on collateral review under § 2255.[19]

_____

[19] That is the position taken by the United States and District Judge Armijo of this district in another § 2255 case that arose in the same posture — *United States v. Victor Lindsey,* CR 01-588 MCA. There, the sentence and judgment was issued, and an appeal was taken in 2003, before *Blakely* or *Booker* were decided. *See, e.g., United States v. Lindsey,* CR 01-588 MCA (Docs. 316-18, 320, 323); *see also United States v. Lindsey, United States' Response Brief,* 2004 WL 3481905 (2004) (for direct appeal in CIV 01-588 MCA). The Tenth Circuit's decision on direct appeal noted that defendant's counsel attempted to raise a *Booker* claim in a Rule 28(j) letter, which was denied, and that counsel had not requested or filed supplemental briefing. Therefore, the Tenth Circuit declined to address the claim. *United States v. Lindsey,* 389 F.3d 1334, 1135, n.1 (10th Cir. 2004). Lindsey then raised the *Booker* claim in his subsequent § 2255 petition. The

Thus, Defendant is in no better position on collateral review than he would have been if his attorney was successful in having the claim decided on direct review.[20]

Defendant does not disagree. Evidently referring to the weight of the drugs, Defendant claims that "[f]acts used to enhance Petitioner were not found by a jury" in violation of *Booker*, and that "the difference in sentencing is plain error and prejudicial and he must be resentenced." *See Doc. 1* at 7 (Ground 1). Though this only raises constitutional *Booker* error, I will address both types.

The plain-error standard is a four-prong test, each of which must be established by Defendant for him to prevail on either sort of *Booker* claim. For the purposes of discussion, I will assume that the first two prongs — error that is plain — are met, and proceed to the third and fourth prongs. *See, e.g., Dazey,* 403 F.3d at 1174-75; *Gonzalez-Huerta,* 403 F.3d at 736, 737.

    *c.* ***Constitutional Booker Error.*** To show that an error affected his

---

United States noted the unusual posture and was of the view the plain error standard should apply. *See Lindsey v. United States,* CIV 05-193 MCA/WDS (Doc. at 13-14 & n.9). Magistrate Judge Daniel Schneider agreed. *See id.* (Doc. 12 at 7) ("Petitioner did not raise a *Booker* issue before the District Court, as *Booker* was decided during the course of Petitioner's appeal. Therefore, his claim is only reviewable for plain error.") (citing *United States v. Sanchez-Cruz,* 392 F.3d 1196 (10th Cir. 2004), a decision that was vacated and remanded on by the Supreme Court to the Tenth Circuit on direct appeal in light of *Booker*).

    [20] The harmless error standard, which places the burden on the United States, applies when *Booker* error is preserved at the trial court level. *See, e.g., United States v. Allen,* 134 Fed. Appx. 261, 263 (10th Cir. 2005) (raising *Blakely* error at trial level sufficient to preserve subsequent argument based on *Booker*).

substantial rights, Defendant has to show that the error was prejudicial:  it must have affected the outcome of the district court proceedings.  *See United States v. Ray,* 147 Fed. Appx. 32, 35-36 (10th Cir. 2005) (quoting *Dazey,* 403 F3d at 1175). That is, Defendant must show "a reasonable probability that a jury applying a reasonable doubt standard would not have found the same material facts that a judge found by a preponderance of the evidence" and this "requires the appellate court to review the evidence submitted at the sentencing hearing and the factual basis of any objection the defendant may have made to the facts on which his sentence was predicated."  *Dazey,* 403 F.3d at 1175.

I have analyzed that evidence above, including Defendant's claims that the weight should have been lower due to packaging materials.  Judge Vela took care to clarify testimony about quantity at trial, and made his findings at the close of trial based solely on the evidence introduced at trial.  He did not base his findings on additional evidence apart from what the jurors heard.  Therefore, I cannot conclude that the jurors would have found a different amount had they been asked to pinpoint exactly how much "more" marijuana and cocaine they meant when they found defendants conspired to import in excess of the quantities mentioned in the indictment.  *See United States v. Magallanez,* 408 F.3d 672, 686-87 (10th Cir.), *cert. denied,* 126 S. Ct. 468 (2005); *Ray,* 147 Fed. Appx. at 36; *United States v.*

*Cuevas-Juarez,* 139 Fed. Appx. 945, 949-50 (10th Cir. 2005); *United States v. Hardridge,* 139 Fed. Appx. 47, 53-54 (10th Cir. 2005).

Alternatively, Defendant can show "that the district court's error affected his substantial rights by demonstrating a reasonable probability that, under the specific facts of his case as analyzed under the sentencing factors of 18 U.S.C. § 3553(a) [offense and offender characteristics, guideline range, need for sentencing uniformity between similarly-situated defendants], the district judge would reasonably impose a sentence outside the Guidelines range." *Dazey,* 403 F.3d at 1175.

Here, sentencing counsel did argue for a downward adjustment based on the fact that the co-defendants who pleaded guilty received lighter sentences, and he was in the same factual posture as them, with no criminal history. *See Duran-Salazar,* CR 02-501 (Doc. 82 at 2). Thus, sentencing counsel was essentially arguing for application of the § 3553(a) factors in asking for sentencing parity between identically-situated defendants. Judge Johnson disagreed with the factual premise, and did not give Defendant an adjustment for a minor role, noting that Defendant went to trial, did not testify, and also chose not to "debrief[] or give[] a statement to governmental authorities." *Id.* (Doc. 93 at 2). His decision and statements during sentencing do not reveal whether he would have granted the

downward adjustment had Defendant met his burden.  They also do not indicate a

view that Defendant did not warrant the imposition of the minimum Guideline

sentence he imposed.  *See Dazey,* 403 F.3d at 1175 ("if during sentencing the

district court expressed its view that the defendant's conduct, based on the record,

did not warrant the minimum Guidelines sentence, this might well be sufficient to

conclude that the defendant has shown that the *Booker* error affected the

defendant's substantial rights."); *Ray,* 147 Fed. Appx. at 37 ("In this case the

District Court did not make any such statement.  Moreover, the District Court

declined to sentence Mr. Ray to the minimum possible sentence within the

Guidelines range.").

     Finally, even if Defendant had met the third prong, he has not met the fourth

because I do not find a "particularly egregious" constitutional error that rises to the

level of a "miscarriage of justice."

> It is true that the court imposed a sentence at the bottom
> of the Guideline range . . .   However, "[t]he district court
> did not make any comment that could be construed as
> expressing dissatisfaction with [defendant's] sentence, nor
> were there any facts in the record to suggest a reasonable
> probability that the district court would have exercised its
> discretion to depart from the Guidelines." . . .  "[T]here is
> nothing to suggest that the court was inclined to go lower,
> even if it had realized it had discretion to do so." . . .
> Defendant's sentence was within the national norm [fn 8.
> The Sentencing Guidelines are the national norm] and,

> while the district court did not state, as did the judge in
> *Magallanez* . . . that he found the sentencing-
> enhancement facts had been "proved 'beyond any doubt
> in my mind,'" the judge clearly was confident in the
> findings he made that underlay the sentencing
> enhancements.
>
> * * * * *
>
> There is nothing in the trial judge's comments to suggest
> that a different result would be likely on remand. The
> sentence imposed in this case was substantially supported
> by the evidence. . . . Our review of the evidence,
> considered in light of the sentencing factors identified in
> 18 U.S.C. § 3553(a), does not suggest a sentence lower
> than that imposed by the district court. Further, we find
> nothing in the evidence here that would suggest a
> complete breakdown in the sentencing process.

*United States v. Westover,* 435 F.3d 1273, 1277-79 (10th Cir. 2006) (citations

omitted); *see also United States v. Lauder,* 409 F.3d 1254, 1270-1279 (10th Cir.

2005). If I have misinterpreted the record and Judge Johnson holds a contrary view,

he can address the *Booker* error on review of these proposed findings and resentence

as he sees fit.

   ***d.   Nonconstitutional Booker Error.***   The third prong for nonconstitutional

*Booker* error requires Defendant to show "a reasonable probability that, but for the

error [of applying the Guidelines mandatorily], the results of the proceedings would

have been different." *Gonzalez-Huerta,* 403 F.3d at 733 (internal quotation and

citation omitted).  I find my discussion above equally applicable to this analysis.

Furthermore, under the fourth prong, again the Tenth Circuit "will not notice a non-constitutional error, . . . unless it is both particularly egregious and our failure to notice the error would result in a miscarriage of justice."  *Gonzalez-Huerta,* 403 F.3d at 736 (internal quotations and citations omitted).  Simply applying the Guidelines mandatorily is not enough.  *Yazzie,* 407 F.3d at 1146-47; *Gonzalez-Huerta,* 403 F.3d at 737-39.  The one "rare" and "compelling" case where the Tenth Circuit has found the fourth prong met is distinguishable because the record here does not indicate that the § 3553(a) factors would warrant a departure in Judge Johnson's view.  *See United States v. Trujillo-Terrazas,* 405 F.3d 814, 816 (10th Cir. 2004); *Gonzalez-Huerta,* 403 F.3d at 739 (discussing situations where other circuits found fourth prong met).  Again, if I have misinterpreted the record and Judge Johnson holds a contrary view, he can address the *Booker* error on review of these proposed findings and resentence as he sees fit.

Wherefore,

**IT IS HEREBY RECOMMENDED THAT:**

1.  The United States' motion *(Doc. 6)* be GRANTED IN PART;

2.  Defendant's request for an evidentiary hearing *(Doc. 9)* be DENIED; and

3.  Defendant's § 2255 petition *(Doc. 1)* be denied on the merits and

dismissed with prejudice.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10**
>
> **DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended
>
> Disposition they may file written objections with the Clerk of the District Court
>
> pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the**
>
> **Clerk of the District Court within the ten-day period if that party wants to have**
>
> **appellate review of the proposed findings and recommended disposition.  If no**
>
> **objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE